1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    BRUCE ANDERSON, et al.,                    Case No. 15-cv-05120-HSG

8                  Plaintiffs,                  **ORDER RE CROSS-MOTIONS FOR**
                                                **SUMMARY JUDGMENT**
9           v.
                                                Re: Dkt. Nos. 94, 121
10

11   MARK GHALY, in his official capacity as
     Secretary of the CALIFORNIA
12   DEPARTMENT OF HEALTH AND
     HUMAN SERVICES
13
                   Defendant.
14

15          Three former California nursing home residents and an advocacy group brought this civil

16   rights lawsuit in November 2015 against the California Secretary of Health and Human Services

17   ("the Secretary").[1]  Dkt. No. 1.  They allege that the Secretary violated their federal rights by

18   failing to establish a "fair mechanism" for hearing nursing home residents' transfer and discharge

19   appeals.  *See id.*  Discovery has now closed, and all parties have moved for summary judgment on

20   the question of the Secretary's liability.  *See* Dkt. Nos. 94 ("Sec. Mot.") and 121 ("Pls. Mot.").

21   Those motions are fully briefed.[2]  The Court held a hearing on the motions on November 18,

22   2021.  Dkt. No. 129.  Having carefully considered the parties' arguments, the Court **GRANTS** the

23   Secretary's motion and **DENIES** Plaintiffs' motion.

24

25   _____

26   [1] Although Plaintiffs initially named former Secretary Diana Dooley as the defendant in this case,
     her successor, Secretary Mark Ghaly, is automatically substituted as a party under Federal Rule of
27   Civil Procedure 25(d).
     [2] *See* Dkt. Nos. 97 ("Opp. Sec. Mot."), 98 ("Reply Sec. Mot."), 123 ("Opp. Pls. Mot."), 124
28   ("Reply Pls. Mot.").

United States District Court
Northern District of California

## I.   BACKGROUND

The individual plaintiffs who brought this case—Bruce Anderson, John Wilson, and Robert Austin—are former residents of certified nursing homes in California.[3]  *See* Dkt. No. 1 ¶¶ 12-14.  Each alleged that he was subject to "dumping," which is when nursing homes send a resident to a hospital for medical or mental health treatment but refuse to readmit them after they have been discharged from the hospital.  Pls. Mot. at 2-4.  Plaintiffs maintain that because Medicaid pays nursing homes less than Medicare or private insurance, nursing homes have a strong incentive to dump residents that participate in Medicaid.  *Id.*  "Dumping," they allege, is "one of the greatest threats" nursing home residents in California face.  *Id.*

Both federal and California law regulate nursing homes that participate in Medicaid. Through the laws and regulations summarized below, both make it unlawful for a nursing home to dump residents just because they seek to pay with Medicaid.

### A.   Federal Statutory and Regulatory Scheme

Medicaid is a cooperative federal-state program under which the federal government provides funding to states to allow them to provide medical services to low-income persons.  *See* 42 U.S.C. § 1396-1; *see also Grammer v. John J. Kane Reg'l Centers-Glen Hazel*, 570 F.3d 520, 523 (3d Cir. 2009).  States are not required to participate in Medicaid, but those that do accept federal funding must comply with the Medicaid Act and with regulations promulgated by the Secretary of Health and Human Services.  *Grammer*, 570 F.3d at 523.  One of the services that Medicaid funds is treatment at "nursing facilities," also known as nursing homes or long-term care facilities.  *See* 42 U.S.C. § 1396d(a).

In 1987, Congress amended the Medicare and Medicaid Acts to provide more oversight of nursing homes that participate in Medicare and Medicaid programs.  *See* H.R. Rep. No. 100-391,

---

[3] Sadly, both Mr. Wilson and Mr. Austin have passed away during this lawsuit.  *See* Pls. Mot. at 6. Because they no longer have Article III standing to pursue claims, the Court's analysis will focus on Plaintiff Anderson's claims.  *See LN Mgmt., LLC v. JPMorgan Chase Bank, N.A.*, 957 F.3d 943, 955 (9th Cir. 2020) ("We therefore join our sister circuits in holding that a party cannot maintain a suit on behalf of, or against, or join, a dead person, or in any other way make a dead person (in that person's own right, and not through a properly-represented estate or successor) party to a federal lawsuit.").

United States District Court
Northern District of California

pt. 1, at 452; *see also Grammer*, 570 F.3d at 523.  The resulting amendments, the Federal Nursing

Home Reform Amendments ("FNHRA"), require nursing homes to meet certain standards before

they can be reimbursed under Medicaid.  Those requirements are codified at 42 U.S.C. § 1396r.[4]

FNHRA gave nursing home residents "[t]ransfer and discharge rights," which it protects

by requiring nursing homes to meet certain conditions before they may lawfully transfer or

discharge a nursing home resident.  Under FNHRA, a nursing home may only discharge a resident

for six reasons.  *Id.* § 1396r(c)(2)(A).[5]  And if a nursing home does seek to transfer or discharge a

resident, it must first provide notice.  *Id.* § 1396r(c)(2)(B).  That notice must, among other

required information, inform the resident of her right to appeal the transfer or discharge.  *Id.* §

1396r(c)(2)(B)(iii)(I).

FNHRA accordingly requires states to provide nursing home residents with a "fair

mechanism" for hearing appeals of their transfers and discharges.  42 U.S.C. § 1396(e)(3).  A

state's mechanism for hearing these appeals must meet "minimum standards" established through

regulation by the United States Secretary of Health and Human Services.  42 U.S.C. § 1396(f)(3).

---

[4] Medicare, the federally-funded counterpart to Medicaid that provides health insurance to older and disabled individuals, also provides coverage for nursing home services.  *See* 42 U.S.C. § 1395d(a).  FNHRA also amended the Medicare Act with substantially identical provisions.  *See id.* § 1395i-3.

[5] Specifically, a nursing facility must permit each resident to remain in the facility and must not transfer or discharge the resident from the facility unless:

> (i)    the transfer or discharge is necessary to meet the resident's welfare and the resident's welfare cannot be met in the facility;
>
> (ii)   the transfer or discharge is appropriate because the resident's health has improved sufficiently so the resident no longer needs the services provided by the facility;
>
> (iii)  the safety of individuals in the facility is endangered;
>
> (iv)   the health of individuals in the facility would otherwise be endangered;
>
> (v)    the resident has failed, after reasonable and appropriate notice, to pay (or to have paid under this subchapter or subchapter XVIII on the resident's behalf) for a stay at the facility; or
>
> (vi)   the facility ceases to operate.

42 U.S.C. § 1396r(c)(2)(A).

United States District Court
Northern District of California

1   Those regulatory standards, in turn, require states to grant a hearing to any nursing home resident

2   who believes that a nursing home "erroneously determined" that she must be transferred or

3   discharged.  42 C.F.R. § 431.220(a)(2).  The regulations also set forth procedural requirements for

4   the hearing itself.  *See id.* §§ 431.240-.243.  Ultimately, if the hearing decision is favorable, the

5   regulations require the relevant state agency to "promptly make corrective payments" and, "if

6   appropriate, provide for admission or readmission of an individual to a facility."  *Id.* § 431.246.

7   **B.   California's Regulation of Nursing Homes**

8       California primarily regulates nursing homes through two different government agencies.

9   The first is the California Department of Public Health ("CDPH"), which is responsible for

10  inspecting and licensing health facilities in California.  Cal. Health & Safety Code § 1254(a).

11  With authority provided by the Long Term Care Act, CDPH administers a citation system, an

12  inspection and reporting system, and a provisional licensing mechanism, which are all designed to

13  "protect patients from actual harm and encourage health care facilities to comply with the

14  applicable regulations."  *Jarman v. HCR ManorCare, Inc.*, 10 Cal. 5th 375, 383 (2020); Cal.

15  Health & Safety Code §§ 1417 *et seq.*  If CDPH determines that a nursing home has wrongfully

16  refused to readmit one of its residents, CDPH is authorized to use a variety of enforcement powers

17  against the nursing home, including issuing citations and monetary penalties.  *See* Cal. Health &

18  Safety Code §§ 1423–1425, 1428.

19      The second agency is the California Department of Health Care Services ("DHCS"), which

20  oversees California's implementation of Medicaid through the California Medical Assistance

21  Program, or Medi-Cal.  *See* Cal. Welf. & Inst. Code §§ 14000.4, 14063.  As required by FNHRA,

22  the Medi-Cal program allows nursing home residents who believe they have been erroneously

23  transferred or discharged to appeal the nursing home's decision to DHCS.  *See* Cal. Health &

24  Safety Code § 100171.  Similarly, if a nursing home refuses to readmit one of its residents who

25  has been hospitalized and asserts a right to readmission, the resident may appeal the nursing

26  home's refusal in a hearing before DHCS.  *Id.* § 1599.1(h)(1).  The Office of Administrative

27  Hearings and Appeals ("OAHA"), a division within DHCS, conducts those hearings and issues an

28

order.  *See* Dkt. No. 56-7 ¶¶ 11-12.[6]  Either party to the OAHA hearing may appeal DHCS's

decision by filing a writ of administrative mandamus to a state superior court.  *See* Cal. Civ. Proc.

Code § 1094.5.  After a successful appeal, the superior court may order DHCS to vacate an

adverse hearing decision.  *See* Cal. Civ. Proc. Code § 1094.5(f); *see also St. John of God Ret. &*

*Care Ctr. v. State Dep't of Health Care Servs.*, 2 Cal. App. 5th 638, 647, 206 Cal. Rptr. 3d 406

(2016).

　　　　For most of the time since this case was filed, nursing home residents had limited

opportunities to enforce a favorable DHCS order.  DHCS itself took the position that once it

"issues its final order, it does not retain jurisdiction in the matter and has no authority to enforce

its own orders."  *See* Dkt. No. 56-11 (August 6, 2015 letter from OAHA Chief Administrative

Law Judge Stevenson).  In theory, a nursing home resident could appeal DHCS's favorable

decision to a state superior court.  But in practice, there is no provision allowing the superior court

in the mandamus proceeding to order compliance with a DHCS decision.  *See Anderson*, 930 F.3d

at 1071.  And while CDPH may independently investigate a complaint that resulted in a resident's

request for a DHCS hearing, and then may choose to issue a citation or a fine, CDPH's remedial

powers are technically independent of the DHCS hearing process.  *See* Dkt. No. 56-14 (CDPH

Memorandum dated Oct. 23, 2008).  CDPH has taken the position that it is not bound by a DHCS

decision because it "is not a party involved in the [OAHA] proceedings," which are "between the

resident and the facility."  *Id.*  CDPH therefore does not issue citations based upon DHCS

decisions alone.  *Id.*

　　　　On July 27, 2021, after the close of discovery in this case, California's Governor signed

A.B. 133.  *See* A.B. 133 Chap. 143 (2020-21).  That law, among other things, expands DHCS's

---

[6] The Court will consider Plaintiffs' declarations, the administrative letters, documents relating to
CDPH's investigations of the facilities, and state court decisions as sufficiently authenticated
evidence relevant to the motion for summary judgment.  *See Fraser v. Goodale*, 342 F.3d 1032,
1036 (9th Cir. 2003).  The focus at this stage in the proceeding is the admissibility of the
documents' contents. *Fed. Deposit Ins. Corp. v. N.H. Ins. Co.*, 953 F.2d 478, 485 (9th Cir.1991)
("the nonmoving party need not produce evidence in a form that would be admissible at trial in
order to avoid summary judgment.").  Plaintiffs and counsel have directly explained in their
declarations their basis for personal knowledge as to the contents of the evidence, which is enough
at this stage.

United States District Court
Northern District of California

statutory authority to enforce its own readmission orders.  It requires nursing homes to demonstrate "timely" compliance with a DHCS readmission order by filing a "certification of compliance" within three calendar days of being served with the order.  Cal. Welf. & Inst. Code § 14126.029(d).  And it also vests DHCS with authority to assess penalties of $750 for each calendar day that the facility fails to comply with a readmission order, up to $75,000.  *Id.* §§ 14126.029(c)(1)-(3).

California law also allows current or former nursing home residents to bring a civil lawsuit against a facility that violates their federal or state rights.  Cal. Health & Safety Code § 1430(b)(1).  California recently enacted A.B. 849, which expands that right in two ways.  A.B. 849 Chap. 471 (2021-22).  First, a current or former resident's legal representative, personal representative, or successor in interest is now also authorized to sue the nursing home.  Cal. Health & Safety Code § 1430(b)(1).  Second, nursing homes may now face steeper monetary penalties.  While plaintiffs could previously seek $500 in damages against a nursing home for each cause of action, they may now seek $500 per regulatory violation.  *See id.* §§ 1430(b)(1)(A)-(B).

### C.     The Parties

What happened to Plaintiff Bruce Anderson is undisputed.  He was a resident of a skilled nursing facility called Norwood Pines Alzheimer Center ("Norwood Pines").  *See* Dkt. No. 13-1, Declaration of Sara Anderson ("Anderson Decl.") ¶ 2.  In May 2015, Anderson went to Sutter Health Treatment to treat his pneumonia.  *Id.* ¶ 4.  But when he recovered, Norwood Pines refused to readmit him.  *Id.*  Anderson appealed to DHCS, which held a hearing and concluded that by refusing to readmit him, Norwood Pines "failed to comply with federal readmission requirements[.]"  *See* Dkt. No. 13-2 at 9-10.  The DHCS order said that "Norwood Pines Alzheimer Center MUST immediately readmit to Resident, Bruce Anderson, to the first available bed."  *Id.* (emphasis in original).  But Norwood Pines did not readmit him.  Anderson Decl. ¶ 8.

In July 2015, the California Advocates for Nursing Home Reform ("CANHR"), a nonprofit advocacy group and the other plaintiff in this case, sent a letter to DHCS asking it to enforce its decision in Anderson's appeal.  *See* Dkt. No. 121-5, Declaration of Anthony Chicotel ("Chicotel Decl.") ¶ 16.  In response, DHCS claimed that it "ha[d] no authority to enforce its own

United States District Court
Northern District of California

United States District Court
Northern District of California

orders," but noted that it was "looking at the issue." *Id.* ¶¶ 17-19. During this time, CDPH also investigated Norwood Pines and, in December 2016, issued a "B" citation and assessed a penalty of $11,850.00 for its failure to readmit Anderson. *See* Dkt. No. 38 at 48-59. Ultimately, after Anderson was denied readmission by Norwood Pines, his daughter consented to his placement at Chaparral House, another skilled nursing facility. *See* Dkt. No. 94-2 at 127.

### D.   Procedural History

Plaintiffs filed this lawsuit in November 2015. Dkt. No. 1. They sued the California Secretary of Health and Human Services and alleged that she violated their federal rights by failing to establish a "fair mechanism" for hearing nursing home residents' transfer and discharge appeals as FNHRA requires. *Id.*

The Secretary filed a motion to dismiss Plaintiffs' Complaint, which the Court granted. *See* Dkt. No. 23. The Court held that because FNHRA did not create an individual right to appeal a nursing home discharge or transfer, Plaintiffs could not challenge California's alleged violation of FNHRA under 42 U.S.C. § 1983. *Id.* The Ninth Circuit reversed, holding that FNHRA created an individual right to appeal a nursing home discharge or transfer—a right that "includes state implementation of the decision on appeal." *See Anderson*, 930 F.3d at 1080-81. However, the *Anderson* panel also held that Plaintiffs' Complaint failed to allege a violation of that right because it did not allege that California "provides no mechanism whatsoever" to enforce readmission orders. *Id.* at 1081.

In light of the Ninth Circuit's opinion, Plaintiffs filed the First Amended Complaint in September 2019. *See* Dkt. No. 35 (or "FAC"). The Secretary again moved to dismiss and the Court denied the motion in January 2020. Dkt. No. 43. Plaintiffs then filed motions for partial summary judgment and for preliminary injunction, which were also both denied in June 2020. Dkt. No. 78.

The Secretary filed the pending motion for summary judgment after the close of discovery. Dkt. No. 94. After briefing on the Secretary's motion was complete, the Court invited the United States Center for Medicare and Medicaid Services ("CMS") to file an *amicus curiae* brief. Dkt. No. 102. In response, the United States filed its Statement of Interest in September 2021. Dkt.

No. 112 (or "USA SOI").  In October 2021, Plaintiffs filed their pending motion for summary judgment.  Dkt. No. 121.

## II.    LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* The Court views the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).

The moving party bears both the ultimate burden of persuasion and the initial burden of producing those portions of the pleadings, discovery, and affidavits that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party will not bear the burden of proof on an issue at trial, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Where the moving party will bear the burden of proof on an issue at trial, it must also show that no reasonable trier of fact could not find in its favor. *Celotex Corp.*, 477 U.S. at 325.  In either case, the movant "may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence." *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1105.  "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id.* at 1102–03.

"If, however, a moving party carries its burden of production, the nonmoving party must

produce evidence to support its claim or defense." *Id.* at 1103.  In doing so, the nonmoving party

"must do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  A nonmoving party must also "identify with

reasonable particularity the evidence that precludes summary judgment."  *Keenan v. Allan*, 91

F.3d 1275, 1279 (9th Cir. 1996).  If a nonmoving party fails to produce evidence that supports its

claim or defense, courts enter summary judgment in favor of the movant.  *Celotex Corp.*, 477 U.S.

at 323.

## III.    DISCUSSION

The Secretary raises several reasons why he believes the case is not justiciable and all

parties have moved for summary judgment on the question of the Secretary's liability.  As

explained below, the Court first finds that the case is justiciable and then concludes that the

Secretary is entitled to summary judgment.

### A.    Justiciability

#### i.    Article III Standing

The Secretary first contends that Plaintiffs lack standing to maintain this lawsuit.  The

remaining plaintiffs are (1) Bruce Anderson, who, as described above, alleges that he obtained a

DHCS readmission order but was not readmitted to his former nursing home; and (2) CANHR,

which is a statewide nonprofit organization.  Chicotel Decl. ¶ 3.  The Court finds that both

Plaintiffs have standing.

Both individuals and organizations must satisfy three conditions to have standing.  They

must show that (1) they have suffered an injury-in-fact, meaning an injury that is "concrete and

particularized" and "actual and imminent;" (2) the alleged injury is "fairly traceable" to the

defendants' conduct; and (3) it is "more than speculative" that their injury is judicially redressable.

*E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1265 (9th Cir. 2020) ("*East Bay II*").  Since

these elements are an "indispensable" part of the plaintiff's case, "each element must be supported

in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the

manner and degree of evidence required at the successive stages of the litigation."  *Lujan v. Defs.*

*of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136-37 (1992).  This means that, at the

1    summary judgment stage, the plaintiff can no longer rest on mere allegations, and must instead

2    produce specific facts, which the Court assumes are true, by affidavit or other evidence.  *Id.* at

3    561.

4         The Court previously held that Plaintiff Anderson plausibly alleged the elements of

5    standing and now finds that those elements are also supported at this stage in the litigation.  *See*

6    Dkt. No. 43 at 7-8.  Plaintiff Anderson's "injury in fact" is that California allegedly left him with

7    no mechanism to enforce the DHCS readmission order he obtained against his former nursing

8    home, Norwood Pines.  Anderson Decl. ¶¶ 8-9.  As the Court previously explained, Plaintiff

9    Anderson's injury is "concrete and particularized" because it forced him to stay in a hospital for

10   over 230 days, isolating him from his friends and family.  *See* Dkt. No. 43 at 7-8; Anderson Decl.

11   ¶ 12.  And finally, that injury is "fairly traceable" to the Secretary's alleged failure to require the

12   agencies he oversees to enforce DHCS readmission orders and, as further explained below, could

13   theoretically be judicially redressed by injunctive relief.  Plaintiff Anderson has therefore

14   produced enough facts to justify his standing to maintain this lawsuit.

15        The Court also finds that CANHR has met its burden of proving that is has both direct and

16   associational standing.  *See Lujan*, 504 U.S. at 561.  Organizations like CANHR can assert

17   standing on behalf of themselves or their members.  *East Bay II*, 950 F.3d at 1265.  An

18   organization has "direct standing" if it establishes that the defendant's behavior has "frustrated its

19   mission and caused it to divert resources in response to that frustration of purpose."  *Id.*

20        Here, CANHR has sufficiently shown that the Secretary's allegedly unlawful behavior has

21   done so.  Mr. Chicotel, who is a staff attorney for CANHR, explains that CANHR is "dedicated to

22   improving the care and quality of life for California's skilled-nursing-facility residents[.]"

23   Chicotel Decl. ¶ 3.  According to Chicotel, the dumping of nursing-home residents into hospitals

24   is "the single most vexing issue" that he deals with at CANHR.  *Id.* ¶ 2.  Chicotel also explains

25   that, over the last decade, CANHR staff has spent resources fielding a "significant increase in the

26   number of calls about individuals who have been illegally discharged" and representing some of

27   these individuals at readmission hearings before DHCS.  *Id.* ¶¶ 4-5.

28        Accepting these facts as true, the Court finds that by allegedly failing to establish a "fair

mechanism" for hearing transfer and discharge appeals, the Secretary has frustrated CANHR's mission to improve the care and quality of life for California's nursing home residents. And CANHR has also sufficiently shown that the Secretary's allegedly unlawful conduct caused it to divert resources from the other ways it seeks to serve its constituency—like educating nursing-home residents about their rights, training facility staff, advocates, and lawyers, or sponsoring and lobbying for legislation. *Id.* ¶¶ 4-5, 8. CANHR has therefore suffered a direct injury in fact.

As to associational standing, an organization must establish that: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1109 (9th Cir. 2003).

CANHR has also shown that it meets the elements for associational standing. First, CANHR's members would otherwise have standing to sue in their own right. As the Court has already explained, each CANHR member who has been unlawfully discharged from a nursing home has suffered a concrete and particularized injury because they are unable to return to their desired home.[7] *See* Dkt. No. 43 at 7-8. Those injuries are "fairly traceable" to the Secretary's alleged failure to establish a fair mechanism for hearing appeals and, as further explained below, could theoretically be judicially redressed by injunctive relief. *Id.* at 8. Second, the § 1983 claim CANHR asserts against the Secretary for allegedly failing to establish a fair mechanism for hearing appeals is "germane" to CANHR's purpose of "improving the care and quality of life for California's skilled-nursing-facility residents." Chicotel Decl. ¶ 3. And finally, the individual

_____

[7] Citing testimony that CANHR members do not pay regular dues or receive a membership card, the Secretary argues that CANHR cannot have associational standing because it is "not a membership organization, in the sense that, while it produces a monthly email newsletter, it has no formal members." Sec. Mot. at 5, 25. The Court finds this argument to be "overly formalistic," since CANHR's members expressly join as "members," fund CANHR through their donations, and use CANHR's services such as its hotline. Dkt. No. 97-9 ¶¶ 3-5; *see also Oregon Advocacy Center*, 322 F.3d at 1110. At bottom, CANHR "is sufficiently identified with and subject to the influence of those it seeks to represent as to have a personal stake in the outcome of the controversy." *Oregon Advocacy Center*, 322 F.3d at 1111 (citations and quotation marks omitted).

residents' participation in this lawsuit is not necessary to establish the Secretary's liability or shape the appropriate relief because CANHR seeks only broad injunctive and declarative relief. *See* FAC at 13-14; *see also United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546, 116 S. Ct. 1529, 1531 (1996) ("'[I]ndividual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members[.]"); *Demille v. Belshe*, No. C-94-0726-VRW, 1994 WL 519457, at *3 (N.D. Cal. Sept. 16, 1994) ("CANHR's suit poses primarily legal questions regarding the interpretation of California's statutory scheme, and the relief requested is merely an injunction preventing enforcement of that framework. Neither of these call for CANHR's members to be present."). CANHR has accordingly also suffered an associational injury.

How this Court can redress either Plaintiff Anderson's or CANHR's injuries, however, is less than clear. Over the course of this lengthy litigation, the Court believes that Plaintiffs have been evasive about what, in their view, a legally sufficient "enforcement mechanism" would require. *See* FAC at 13-14 (seeking, among other things, "[e]quitable relief, including without limitation, an injunction prohibiting Defendant's illegal practices"); Dkt. No. 43 at 10-11 ("The Court will confess that it continues to find Plaintiff's precise theory of relief—i.e., what the requested declaratory and injunctive relief order would actually *say*—less than entirely clear.") (emphasis in original). Even now, Plaintiffs ask the Court to limit its analysis only to "the question of liability" and claim that "[t]he appropriate remedy is a question that can be answered another day." Pls. Mot. at 2. n.1.

The Secretary argues that because Plaintiffs have failed to request the particular remedy they seek, let alone describe it in detail, it is "impossible" for the Court to determine whether relief could redress Plaintiffs' claimed harm. Opp. Pls. Mot. at 7-8. But that argument goes too far. Plaintiffs' earlier motion, for instance, sought an injunction ordering the Secretary to implement "an escalating system of enforcement penalties" under which the State would, among other things, impose various fines and citations against nursing homes that violate FNHRA. Dkt. No. 57 at 23-24. And Plaintiffs claim that many of these enforcement mechanisms are already within DHCS's current authority—a point the Secretary himself argued in his original Motion to

Dismiss.  *See* Reply Pls. Mot. at 14; Dkt. No. 11 at 6-7.  Although it is a close call, the Court finds that it is "more than speculative" that these measures, if enforced, would redress CANHR's injuries.[8]  The Court accordingly finds that both Plaintiffs have standing to maintain this lawsuit at this stage in the litigation.

### ii.   Mootness

The Secretary also contends that even if the parties have standing, two recent factual developments now render the lawsuit moot.  If the Secretary is right, then this Court lacks jurisdiction.  *See Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1155 (9th Cir. 2017) ("A federal court lacks jurisdiction to hear a case that is moot.").

A case is moot "where no actual or live controversy exists."  *Id.* (citation omitted).  Mootness has also been described as standing set in a time frame: the personal interest that must exist at the beginning of the litigation (standing) must continue throughout its existence (mootness).  *Id.*

The Secretary makes two mootness arguments.  He first contends that California's recent passage of A.B. 133 and A.B. 849 renders the entire lawsuit moot.  Opp. Pls. Mot. at 10-13.  Because these new laws have "significantly expanded" California's available remedies to enforce the Plaintiffs' rights, the Secretary argues, there is no longer a "live" controversy in this case.  *Id.*  But the Court disagrees.  The Secretary's argument ignores the fact that Plaintiffs dispute the lawfulness of his *current* conduct—not merely the conduct that precipitated the lawsuit.  *See* Reply Pls. Mot. at 1 ("[T]he State's enforcement mechanism violates federal law. And the new law the State references fails for the same reasons.").  So the controversy at the heart of this

---

[8] Relatedly, the Secretary argues that an order directing him to create a remedial process that interferes or is at odds with state law and legislative intent would violate principles of abstention, federalism, and comity.  Opp. Pls. Mot. at 9-10.  The Court has likewise observed that the relief Plaintiff seeks "could pose a raft of complicated federalism questions."  Dkt. No. 78 at 11.  But, without presuming to identify the precise boundaries of Plaintiffs' substantive right to "some state-provided process capable of providing relief," *Anderson*, 930 F.3d at 1075, the Court notes that a narrower order directing the Secretary to implement enforcement mechanisms already within his authority could theoretically redress Plaintiffs' claims without necessarily requiring "heavy federal interference in [ ] sensitive state activities."  *L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 703 (9th Cir. 1992).

United States District Court
Northern District of California

case—which is whether the Secretary provides Plaintiffs with a "fair mechanism" for hearing discharge and transfer appeals—is still live.  And the fact that California enacted laws that expand available enforcement remedies does not deprive Plaintiffs of a "legally cognizable interest in the outcome" of this lawsuit, or render it moot.  *See Already, LLC v. Nike, Inc*., 568 U.S. 85, 91 (2013) (citations omitted).

The Secretary next argues that Plaintiff Anderson's claim for relief is moot because his daughter has since consented to his placement at another nursing home.  *See* Reply Sec. Mot. at 11-12; Dkt. No. 94-2 at 127.  The Court also finds this argument unpersuasive.  Plaintiff Anderson's discharge from the hospital to someplace other than Norwood Pines has no bearing on his "injury in fact," which is that California allegedly left him with no mechanism to enforce the DHCS readmission order he obtained.  To the extent the Secretary implies that even if Plaintiff Anderson had enforcement mechanisms to penalize Norwood Pines, he would choose not to exercise those rights, the Court finds that argument too speculative to deprive Plaintiff Anderson of standing—particularly since it must view the record in the light most favorable to the nonmoving party and may not weigh the evidence or make credibility determinations.  *See Freeman*, 125 F.3d at 735.  In short, Plaintiff Anderson seeks an order requiring the Secretary to create a "fair mechanism" in California to hear his nursing home discharge and transfer appeal.  That he was ultimately forced to find another nursing home even though he won his appeal exemplifies his concerns and does not deprive him of standing to pursue the relief he seeks.

### iii.   CANHR Private Right of Action

As a final justiciability argument, the Secretary claims that CANHR does not have a federal right to appeal a nursing home discharge or transfer under FNHRA and therefore must be dismissed as a defendant.  *See* Sec Mot. at 23-26.  Although the *Anderson* court held that FNHRA "created a right benefiting nursing home residents" enforceable under § 1983, the Secretary correctly notes that it did not address whether that right extends to organizations like CANHR.  *See Anderson*, 930 F.3d at 1075.

The parties have not identified controlling precedent on this issue, but at least one district court has held that an association that has standing to assert a claim on behalf of its constituents

may assert that claim under the private right of action available to those constituents.  *See Texas Democratic Party v. Hughs*, 474 F. Supp. 3d 849, 860 (W.D. Tex. 2020) ("The same facts that establish organizational and associational standing, discussed supra, also demonstrate standing to sue for voting rights violations under 52 U.S.C. § 10101(a)(2)(B), using 42 U.S.C. § 1983 as a vehicle for remedial relief"), *rev'd and remanded on different grounds*, 860 F. App'x 874 (5th Cir. 2021); *see also Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 441-42, 445-48 (6th Cir. 2020) (holding first that an organization that advocated for individuals with developmental disabilities had associational standing on behalf of such individuals, and then that "Plaintiffs have a private right of action under" certain provisions of the Medicaid Act); *Watson v. Weeks*, 436 F.3d 1152, 1154, 1162 (9th Cir. 2006) (holding that individuals and an organization that advocated on their behalf "have established a section 1983 right" under the Medicaid Act without differentiating between the organization and the individuals).

Ultimately, though, the Court finds this question to be of little practical consequence at this stage in the litigation.  This matter will proceed to the merits because Plaintiff Anderson has standing and, no one disputes, a private right of action enforceable through § 1983.  *See Anderson*, 930 F.3d at 1075.  Because only one plaintiff must have standing to allow a case to proceed, the Court declines to dismiss CANHR.  *See Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1014–15 (9th Cir. 2003) ("We need only find that one petitioner has standing to allow a case to proceed"), *rev'd on other grounds*, 541 U.S. 752 (2004).

### B.    Merits

When this case was first appealed, the Ninth Circuit held that FNHRA gives Plaintiffs an individual right to appeal a nursing home discharge or transfer—a right that "includes the opportunity for some form of state enforcement of the result of the appeal."  *Anderson v. Ghaly*, 930 F.3d 1066, 1075 (9th Cir. 2019).  Critically, though, the Ninth Circuit also held that to state a claim for a violation of that right, Plaintiffs must allege that California "provides no mechanism whatsoever" to enforce administrative orders requiring nursing homes to readmit residents who have been unlawfully transferred or discharged.  *Id.* at 1081.

Discovery has now closed, and all parties have moved for summary judgment on the

United States District Court
Northern District of California

question of the Secretary's liability.  As explained below, California now provides for direct agency enforcement of an administrative readmission order and supplements that direct agency enforcement with further regulatory and private enforcement.  In light of these enforcement mechanisms, the Court finds that, on this factual record, no reasonable trier of fact could conclude that California provides "no mechanism whatsoever" to enforce administrative readmission orders. *Id.*

### i.  Direct Agency Enforcement

To begin, California provides for direct agency enforcement of an administrative appeal order requiring a nursing home to readmit a resident who has been wrongfully discharged or transferred.  As required by FNHRA, California's Medi-Cal program allows nursing home residents who believe they have been erroneously transferred or discharged to appeal the nursing home's decision to DHCS.  *See* Cal. Health & Safety Code § 100171.

Over the course of this litigation, Plaintiffs have repeatedly argued that this mechanism is insufficient because "there is no agency in California that enforces DHCS readmission orders," since "DHCS does not enforce its own decisions and neither does CDPH[.]"  FAC ¶ 43; *see also* Pls. Mot. at 1 ("The California Department of Health Care Services (DHCS) provides a hearing, but it will not enforce its own decisions. The California Department of Public Health (CDPH) also refuses to enforce DHCS decisions because it does not participate in those hearings.").  But that is no longer true.  A.B. 133 explicitly vests DHCS with authority to assess penalties of $750 for each calendar day that a nursing home fails to comply with a DHCS readmission order, up to $75,000. Cal. Welf. & Inst. Code § 14126.029(c)(1)-(3).  Indisputably, DHCS now has a mechanism to enforce its readmission decisions.

So Plaintiffs understandably have changed course.  They now argue that California's system still fails under *Anderson* because A.B. 133 gives DHCS the discretion to choose whether to penalize a nursing home.  *See* Pls. Mot. at 7-8 ("The unavailability of potential remedies simply is not the problem. As Plaintiffs have said all along, the problem is *discretion* . . . . By making enforcement optional, the State does more than render the hearing meaningless: It subverts all the mandatory rights the hearing is supposed to protect.") (emphasis in original).  The Court does not

share that view.

To be sure, Plaintiffs are right that A.B. 133 does not strip DHCS of all discretion to choose whether to penalize a nursing home. § 14126.029 states that a nursing home's failure to timely comply with DHCS's readmission decision "*shall* subject that facility to the issuance of penalties," but that provision is subject to two exceptions laid out in subdivision (g). Cal. Welf. & Inst. Code § 14126.029(e) (emphasis added). There, the statute explains that DHCS "may waive all or a portion" of the penalties if a nursing home petitions for a waiver and DHCS determines, "in its sole discretion," that the nursing home meets two conditions. *Id.* § 14126.029(g). First, DHCS must find that the nursing home "complied with the hearing decision or otherwise demonstrated to [DHCS]'s satisfaction that sufficient corrective action has been taken to remediate the underlying improper conduct." *Id.* § 14126.029(g)(1). And second, DHCS must find that imposing the full amount of penalties "has a high likelihood of creating an undue financial hardship for that facility or creates a significant difficulty in providing services to Medi-Cal beneficiaries." *Id.* § 14126.029(g)(2).

The fact that DHCS may choose not to issue a penalty if it first finds that the nursing home already took sufficient action to remedy the unlawful discharge, however, does not mean that DHCS has "no mechanism whatsoever" to enforce its readmission decisions. *Anderson*, 930 F.3d at 1081.

*Anderson* itself provides no support for Plaintiffs' apparent position that California's system fails simply because A.B. 133 gives DHCS discretion. When Plaintiffs' original complaint alleged that the Secretary violated Plaintiffs' rights because "no agency in California . . . enforces DHCS readmission orders," the Ninth Circuit dismissed that complaint for failure to state a claim and held that § 1396r(e)(3) "does not limit the state-provided enforcement mechanism to direct agency enforcement by the State." *Anderson*, 930 F.3d at 1080. If a state does not violate the FNHRA right to an appeal by entirely failing to provide for direct agency enforcement, the Court does not see how a state could violate that right by providing for direct agency enforcement but giving the agency discretion not to assess fines against nursing homes that have, for instance, already remedied an unlawful discharge. By any reading, Plaintiffs' current position, if pled,

would not state a claim upon which this Court could grant relief.

Plaintiffs' strongest support for the proposition that California's nursing home readmission process cannot give DHCS discretion on how or whether to enforce the FNHRA right to an appeal comes from FNHRA's implementing regulations promulgated by CMS.  *See* 42 C.F.R. § 431.246. Plaintiffs' argument is that states must provide for *mandatory* enforcement of the FNHRA right to an appeal because CMS's "corrective action" regulation explicitly *requires* state agencies to provide for the readmission of a nursing home resident who has been unlawfully discharged.  *See* Reply Pls. Mot. at 7-9.  That regulation is provided in full below:

> The agency must promptly make corrective payments, retroactive to the date an incorrect action was taken, and, if appropriate, provide for admission or readmission of an individual to a facility if (a) The hearing decision is favorable to the applicant or beneficiary; or (b) The agency decides in the applicant's or beneficiary's favor before the hearing.

42 C.F.R. § 431.246.

To be clear, it is the statutory text of § 1396r(e)(3)—not CMS's regulations—that confers Plaintiffs' rights to a "fair mechanism" for hearing appeals.  *Save Our Valley v. Sound Transit*, 335 F.3d 932, 943 (9th Cir. 2003) ("Plaintiffs suing under § 1983 must demonstrate that a statute—not a regulation—confers an individual right.").  Nevertheless, the Court finds that CMS's corrective action regulation may have some relevance in determining the scope of those rights.  *Id.* ("As an agency interpretation of a statute, a regulation may be relevant in determining the scope of the right conferred by Congress.").  But unlike Plaintiffs, the Court does not read that regulation to prohibit California from conferring DHCS with the discretion to choose how and whether to ultimately provide for a nursing home resident's readmission.

This is because the CMS regulation itself calls for state agencies to exercise that discretion. Although Plaintiffs argue that "FNHRA *mandates* readmission following a successful hearing," *see* Reply Pls. Mot. at 9-10 (emphasis in original), the relevant CMS regulation actually says that "[t]he agency must . . . *if appropriate*, provide for admission or readmission of an individual to a facility[.]"  42 C.F.R. § 431.246 (emphasis added).  On its face, "the word 'appropriate' is a deliberately vague indication that some degree of discretion and judgment is called for" in

1    determining whether readmission is the proper remedy.  *Fed. Deposit Ins. Corp. v. Chicago Title*

2    *Ins. Co.*, 12 F.4th 676, 683 (7th Cir. 2021).

3          Just as important, the CMS regulation also does not dictate *how* the state agency should

4    provide for readmission.  *See* USA SOI at 8 ("CMS does not interpret the regulations to require

5    that California necessarily create an additional administrative process to enforce appeal decisions.

6    However, the state must itself have some mechanism (whether through the hearing process, civil

7    suit brought by the state to enforce, or otherwise) whereby the state Medicaid agency ensures that

8    the corrective actions ordered by the hearing officer are promptly taken by nursing homes.").

9    Through A.B. 133, the California Legislature decided that DHCS will provide for readmission by

10   assessing penalties of $750 for each calendar day that a nursing home fails to comply with a

11   DHCS readmission order, up to $75,000.  Cal. Welf. & Inst. Code § 14126.029(c)(1)-(3).  And the

12   Legislature also determined that it is not "appropriate" to assess those penalties when a nursing

13   home already took sufficient corrective action to remedy the unlawful discharge, and when

14   penalizing the nursing home would impose an undue financial hardship on the nursing home or

15   create a significant difficulty in providing services to Medi-Cal beneficiaries.  *Id.* §§

16   14126.029(g)(1)-(2).  In the Court's view, the enforcement mechanism the Legislature created is

17   not inherently inconsistent with CMS's regulations.[9]

18         The bulk of Plaintiffs' remaining arguments essentially boil down to assertions that, in the

19   future, DHCS will choose not to enforce this statute or that nursing homes will "ignore[]" the

20   threat of financial punishment.  *See* Pls. Mot. at 22-23.  But since California enacted A.B. 133 well

21   after the close of fact discovery in this case, the factual record understandably contains no

22   evidence on the new law's effectiveness.  To the extent Plaintiffs' right to a "fair mechanism" for

23

24   _____

     [9] Because both parties offered CMS's past acceptance or criticism of California's nursing home
25   readmission process as evidence in support of their arguments, the Court invited CMS to file a
     submission explaining its position.  *See* Dkt. No. 102.  In response, the United States filed a
26   "Statement of Interest," in which it explains that, in its view, the process that California provides
     "does not satisfy the requirements of FNHRA and its implementing regulations."  USA SOI at 5.
27   But because the United States failed to address California's administrative enforcement
     mechanisms as amended by A.B. 133, its SOI is of little persuasive value on the question of
28   whether California's process currently satisfies the requirements of FNHRA or its implementing
     regulations.  To the extent CMS sees it differently, it remains free to seek to enforce its
     interpretation of the law by using its power to withhold federal funds.  *See* 42 CFR § 430.35.

hearing nursing home discharge appeals depends on how effective California's enforcement scheme is, Plaintiffs' allegation that California's scheme as amended by A.B. 133 will necessarily be ineffective or insufficient is unsupported by facts and is ultimately too speculative for this late stage of the litigation.  *See Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) ("To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations.").  The bottom line is that California now provides for direct agency enforcement of a DHCS readmission order, and there is insufficient evidence in the record to create a genuine dispute about this enforcement mechanism's effectiveness.

### ii.   Supplemental Enforcement Mechanisms

In dismissing Plaintiffs' original complaint for failure to plausibly allege a violation of the FNHRA right to an enforceable appeal, the Ninth Circuit held that FNHRA "does not limit the state-provided enforcement mechanism to direct agency enforcement by the State."  *Anderson*, 930 F.3d at 1080.  The Ninth Circuit explained that "California could, for example, provide that state courts will enforce DHCS hearing decisions through the private cause of action provided by section 1430 of the California Health and Safety Code."  *Id.*  And citing CDPH's citation process, it also explained that Plaintiffs failed to allege "why the administrative remedies provided by California law are unavailable to enforce a favorable order after an appeal that a specific resident be readmitted to a nursing facility."  *Id.* at 1081.

California provides for both of those enforcement mechanisms through the Long-Term Care Act, as part of a detailed statutory scheme regulating the standard of care that nursing homes provide to their patients.  *See Kizer v. Cty. of San Mateo*, 53 Cal. 3d 139, 143, 806 P.2d 1353, 1355 (1991).  The Court need not and does not address whether the Long-Term Care Act's enforcement mechanisms, standing alone, would be sufficient to satisfy Plaintiff's rights to "some state-provided process capable of providing relief."  *Anderson*, 930 F.3d at 1075.  It is enough to recognize that both mechanisms supplement DHCS's authority to enforce a favorable order after an appeal and ultimately bolster California's ability to enforce the result of the appeal.

First, CDPH's citation process is available to enforce state and federal laws prohibiting

United States District Court
Northern District of California

1  unlawful discharges and transfers.  If CDPH confirms a violation of state or federal law relating to

2  the operation or maintenance of a nursing home, California law requires it to either "[r]ecommend

3  the imposition of a federal enforcement remedy or remedies on a nursing facility in accordance

4  with federal law" or "[i]ssue a citation pursuant to state licensing laws[.]"  *See* Cal. Health &

5  Safety Code §§ 1423–1425, 1428; *see also* 42 C.F.R. §§ 488.430, 488.438.

6         Plaintiffs dispute the relevance of CDPH's enforcement powers because, as they see it,

7  CDPH enforces "rules regarding transfers and discharges"—not the actual results of a nursing

8  home resident's FNHRA-mandated readmission hearing.  Opp. Sec. Mot. at 20.  The Court

9  acknowledges this distinction.  Plaintiffs are correct that while CDPH may independently

10 investigate a complaint that resulted in a resident's request for a DHCS hearing, and then may

11 choose to issue a citation or a fine, CDPH technically does not enforce the results of DHCS's

12 readmission decisions.  *See* Dkt. No. 56-14 (CDPH Memorandum arguing that CDPH is not bound

13 by a DHCS decision because it "is not a party involved in the [OAHA] proceedings," which are

14 "between the resident and the facility.").

15        But as the Ninth Circuit recognized, that does not mean that CDPH's enforcement

16 authority is irrelevant to the question of whether California's readmission process "includes the

17 opportunity for some form of state enforcement of the result of the appeal."  *Anderson*, 930 F.3d at

18 1075; *see also id.* at 1081 (Citing CDPH's citation authority under Cal. Health & Safety Code §

19 1423(a) as an "administrative remed[y] provided by California law . . . to enforce a favorable

20 order after an appeal that a specific resident be readmitted to a nursing facility.").  Even though

21 CDPH's focus is "preventative," its inspection and citation process still enforces violations of

22 FNHRA and its implementing regulations.  *See State Dep't of Pub. Health v. Superior Ct.*, 60 Cal.

23 4th 940, 950-51, 342 P.3d 1217, 1222 (2015) (Explaining that CDPH's inspection and citation

24 process "serves to punish by naming and shaming facilities that violate the law.").  By way of

25 example, CDPH investigated Plaintiff Anderson's former nursing home and fined it $11,850.00

26 for its failure to follow federal regulations requiring his readmission.  *See* Dkt. No. 38 at 48-59.

27 The Court accordingly finds that CDPH's citation process provides an administrative remedy that

28 can supplement DHCS's newly-given authority to directly enforce readmission orders.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

Finally, California law supplements administrative action with private enforcement.  By enacting Section 1430(b), "the Legislature specifically authorized skilled nursing facility residents themselves to bring actions to remedy violations of their rights rather than forcing them to depend upon the CDPH to take action."  *Shuts v. Covenant Holdco LLC*, 208 Cal. App. 4th 609, 623–24, 145 Cal. Rptr. 3d 709, 720 (2012).  So if a nursing home unlawfully discharges a resident in violation of FNHRA, for example, Section 1430(b) authorizes the resident to seek money damages, attorneys' fees and costs, and an order enjoining the nursing home from continuing to violate the resident's rights.  Cal. Health & Safety Code § 1430(b)(1)(B) ("For violations that occur on or after March 1, 2021, the licensee shall be liable for up to five hundred dollars ($500) for each violation, and for costs and attorney's fees, and may be enjoined from permitting the violation or violations to continue."); *see also Jarman*, 10 Cal. 5th at 390 ("Section 1430(b) already provides an abundance of reasons for licensees not to transgress its health and safety objectives, which includes the prospect of paying the other side's attorney fees and costs and suffering an injunction with its attendant fine for contempt of court.") (citations and quotation marks omitted).

16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs contend that, as a practical matter, nursing home residents cannot enforce their right to an appeal through a Section 1430(b) lawsuit primarily because the Medi-Cal recipients who are typically the victims of forcible dumping are indigent and cannot afford to find and retain counsel.  *See* FAC ¶ 45.  The Court does not find Plaintiffs' sweeping conclusion persuasive.  Putting aside that the individual Plaintiffs' status as Medi-Cal beneficiaries here did not prevent them from obtaining legal counsel, the Court has already noted that "the practical difficulties to which Plaintiffs point regarding the apparent financial undesirability of these cases for paid (but presumably not pro bono) attorneys do not make the private right of action provision inherently inadequate as a matter of law."  Dkt. No. 78 at 11, n. 9.  Moreover, by increasing the amounts plaintiffs can recover from noncompliant nursing homes and expanding the persons who may bring suit, A.B. 849 appears designed to make it more financially feasible for plaintiffs to bring a Section 1430(b) lawsuit.  *See* Cal. Health & Safety Code § 1430(b)(1).  Given the recency of this legislation, there is insufficient evidence in the record about whether it will be effective in doing

so.

The Court again clarifies that it need not determine whether the availability of a Section 1430(b) lawsuit, standing alone, would satisfy California's obligation to provide a "fair mechanism" for hearing transfer and discharge appeals. When taken together with DHCS's and CDPH's administrative enforcement authority, the availability of private enforcement reinforces the Court's conclusion that Plaintiffs have not shown a genuine issue of fact as to their claim that California provides "no mechanism whatsoever" to enforce the result of a DHCS readmission decision.

*       *       *

Ultimately, the Court is not tasked with determining whether the California Legislature could have devised a different or better system to end the practice of nursing homes "dumping" residents who participate in Medi-Cal. The question before the Court is whether California provides "no mechanism whatsoever" to enforce administrative readmission orders, and the factual record here leaves no room to reasonably dispute that such a mechanism exists. The Court accordingly finds that the Secretary is entitled to summary judgment.

## IV.    CONCLUSION

The Court **GRANTS** Defendant's motion for summary judgment and **DENIES** Plaintiffs' motion. The Clerk is directed to enter judgment in favor of Defendant and to close the case.

**IT IS SO ORDERED.**

Dated:   3/10/2022

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California